IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **ANDREA MILLER,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No: 3:13-1270** |
| | ) | **Judge Campbell** |
| | ) | **Magistrate Judge Knowles** |
| **WOODSTON MADDOX,** *et al.*, | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Comes now Ms. Miller, by and through counsel, and submits this response to

Defendant's Motion for Summary Judgment (ECF 60). Ms. Miller would show:

### FACTUAL BACKGROUND

In August of 2011, Ms. Andrea Miller was living at 612 Baldwin Court in Nashville,

Tennessee, and was temping through the "All-Star" agency at a Wilson Sporting Goods

warehouse in Antioch. (Ex. A, Miller Depo., 21:13 – 21:23, 23:03 – 24:08). On August 30,

2011, Ms. Miller started her Wilson warehouse shift at 3:00 P.M. (Ex. A, Miller Depo., 23:14 –

23:16). Ms. Miller worked a full eight-hour shift, got off at 11:30 P.M., and headed for home,

stopping by Jack in the Box along the way for take-out. (Ex. B, All-Star Records; Ex. A, Miller

Depo., 23:14 – 23:20). Arriving back in her neighborhood at about midnight, Ms. Miller drove

northwest on Cravath Drive as she headed toward Baldwin Court. (Ex. A, Miller Depo., 25:20 –

27:02, 35:04 – 35:12; Ex. C, Map of Baldwin Court Area). As she approached the intersection at

Cravath and Rowan, Ms. Miller stopped at the stop sign, which was set back from the

intersection about fifteen to twenty feet (15 – 20'). (Ex. A, Miller Depo., 35:04 – 35:12). The

1

stop sign was obscured from view from the right, the direction of Baldwin Court, by trees and bushes. (Ex. A, Miller Depo., 36:10 – 36:14; Ex. D, Calvin Miller Depo., 16:08 – 16:14; Ex. E, Andrea Miller Decl., ¶ 4; Ex. E-1, Video).

After coming to a complete stop at the Rowan and Cravath stop sign, Ms. Miller made a right hand turn onto Rowan, heading toward Baldwin Court. (Ex. A, Miller Depo., 29:20 – 29:21; Ex. C, Map of Baldwin Court Area). As she approached the Baldwin Court intersection she saw a police car parked at the stop sign on Baldwin Court, facing Rowan. (Ex. A, Miller Depo., 29:04 – 29:18). Ms. Miller turned right onto Baldwin, driving about twenty miles per hour toward her home at 612 Baldwin Court and traveling well under the speed limit of thirty-five miles per hour. (Ex. A, Miller Depo., 29:20 – 30:02, 32:02 – 32:04; Ex. F, Preliminary Hearing Transcript, 7:02 – 7:08). There were no other cars or pedestrians on the street, and Ms. Miller did not see anyone walking in the yards adjacent to the road.[1] (Ex. A, Miller Depo., 33:23 – 34:16). Ms. Miller's house was eight houses down from the intersection, a distance of about five hundred fifty feet (550'). (Ex. C, Map of Baldwin Court Area; Ex. G, Lot Map of Baldwin Court Area). After Ms. Miller got about five houses down the street she noticed in her rear-view mirror that the police car had pulled out, activated its "blue lights," and was making a U-turn. (Ex. A, Miller Depo., 29:20 – 29:25). The patrol car, driven by Officer Maddox, followed Ms. Miller down Baldwin as she finished out the last two hundred feet (200') of the drive and parked in her driveway. (Ex. A, Miller Depo., 29:20 – 30:02; Ex. G, Lot Map of Baldwin Court Area). Officer Maddox parked in front of Ms. Miller's driveway, blocking her in. (Ex. A, Miller Depo., 30:01 – 30:06). Ms. Miller knew that something was not right with the situation, because she knew that she had not done anything wrong and there was no reason for her to be pulled over.

---

[1] There are no sidewalks on Baldwin Court. (Ex. E-1, Video; Ex. I, Dwight Smith Depo., 25:02 – 25:03).

2

(Ex. A, <u>Miller Depo.</u>, 30:01 – 30:04, 34:17 – 35:03).  She opened her car door, but remained in her car.  (Ex. A, <u>Miller Depo.</u>, 30:11 – 30:15).

Officer Maddox got out of his patrol car and walked up to Ms. Miller's car, aggressively asking why she had not stopped immediately.  (Ex. A, <u>Miller Depo.</u>, 30:07 – 30:10).  Ms. Miller tried to explain that she lived where she had parked and she was just completing the short drive to her home.  *Id.*  Officer Maddox shined his flashlight in Ms. Miller's eyes, and Ms. Miller asked him, "Sir, can you please not shine that flashlight in my eyes."  (Ex. A, <u>Miller Depo.</u>, 30:11 – 30:17).  Without ever asking for her license or registration, Officer Maddox roughly responded, "Get out of the car."  (Ex. A, <u>Miller Depo.</u>, 30:17 – 30:18, 31:05 – 31:09, 35:13 – 35:16).  Ms. Miller asked for Maddox's name and badge number, and he responded, "I'm going to give you more than my name and badge number" and again ordered her out of the car. (Ex. A, <u>Miller Depo.</u>, 30:18 – 30:21).  The commotion got the neighborhood dogs barking, which woke up the next-door neighbor at 608 Baldwin, Ms. Eliza Smith.  (Ex H, <u>Eliza Smith Depo.</u>, 7:22 – 8:05; Ex. C, <u>Map of Baldwin Court Area</u>).   Ms. Smith got out of bed, looked out the window, and saw Maddox standing outside Ms. Miller's car window, loudly demanding that she get out of the car.  (Ex. H, <u>Eliza Smith Depo.</u>, 8:02 – 8:05, 16:23 – 17:09).  Ms. Smith woke her husband Dwight up and then went outside to check on Ms. Miller.  (Ex. H, <u>Eliza Smith Depo.</u>, 8:22 – 9:14).  When Ms. Smith got outside, there was no one else out on Baldwin other than Maddox and Ms. Miller.  (Ex. H, <u>Eliza Smith Depo.</u>, 17:10 – 17:12).  Dwight got out of bed and came outside to Ms. Miller's, and Eliza headed down the street to Ms. Miller's parents' house, just a few blocks away.  (Ex. H, <u>Eliza Smith Depo.</u>, 9:20 – 10:18).

When Dwight came outside there was no one out on Baldwin other than Maddox, Ms. Miller, and Eliza.  (Ex. I, <u>Dwight Smith Depo.</u>, 24:22 – 25:03).  Dwight could see that Ms. Miller

was reluctant to get out of the car, and he thought she might be concerned that Maddox was not really a police officer because there had been a number of recent robberies in the area committed by criminals who used fake police lights to pull people over. (Ex. I, Dwight Smith Depo., 9:24 – 10:02, 11:20 – 11:25). But, Dwight could see that Maddox did appear to be a police officer, and so Dwight told Ms. Miller to go ahead and get out of the car. (Ex. I, Dwight Smith Depo., 10:15 – 10:17). After Dwight told her it was ok, Ms. Miller quickly calmed down and got out of her car. (Ex. I, Dwight Smith Depo., 22:07 – 23:12). Once Ms. Miller was out of her car, Maddox immediately told her to turn around and put her hands behind her back. (Ex. A, Miller Depo., 30:17 – 30:22, 38:07 – 38:18; Ex. I, Dwight Smith Depo., 12:06 – 13:07). Ms. Miller turned around, and Maddox handcuffed her and walked her to his patrol car. (Ex. A, Miller Depo., 30:21 – 31:01). Ms. Miller complied with the arrest, did not struggle, and did not try to pull away. (Ex. A, Miller Depo., 38:15 – 38:23; Ex. I, Dwight Smith Depo., 20:10 – 21:08). Ms. Miller asked Maddox why she was being arrested, and Maddox replied, "For running that stop sign." (Ex. A, Miller Depo., 30:22 – 30:25).

Maddox put Ms. Miller in the back of his patrol car and again started yelling at her, demanding her social security number. (Ex. A, Miller Depo., 31:01 – 31:17). Ms. Miller did not trust the situation because she should not have been stopped or arrested in the first place, and she initially refused to provide her social. *Id*. Maddox stood outside the patrol car back passenger window and yelled in Ms. Miller's face, demanding her social, while Ms. Miller kept trying to explain that she lived at the house where she had parked. *Id*. Meanwhile, Eliza Smith returned with Ms. Miller's father, Calvin Miller, shortly after Maddox put Ms. Miller in the patrol car. (Ex. D, Calvin Miller Depo., 14:12 – 14:21). Calvin approached the patrol car and tried to ask Ms. Miller what was going on, only to have Maddox bark, "Get away from my prisoner" at him.

4

(Ex. D, <u>Calvin Miller Depo</u>., 14:12 – 14:21). Maddox was agitated and out of control, yelling about Ms. Miller running the stop sign and saying that he would "get her" for resisting arrest. (Ex. D, <u>Calvin Miller Depo</u>., 17:20 – 18:09). Ms. Miller and Calvin both tried to explain to Maddox that Ms. Miller lived at 612 Baldwin, but Maddox refused to believe it without some kind of hard evidence. (Ex. A, <u>Miller Depo</u>., 31:13 – 31:17; Ex. F, <u>Preliminary Hearing Transcript</u>, 5:18 – 5:23). At 12:13 A.M., a few minutes after Calvin and Eliza's arrival, a second police officer, Officer Andrew Davis, arrived at the scene. (Ex. J, <u>CAD</u>; Ex. D, <u>Calvin Miller Depo</u>., 14:24 – 15:04).

Officer Davis helped Maddox search Ms. Miller's car, but they found no contraband of any kind. (Ex. K, <u>Maddox Depo</u>., 34:18 – 34:23). They did find two iPods, which Maddox claimed was suspicious. (Ex. D, <u>Calvin Miller Depo</u>., 15:18 – 15:25). As Maddox prepared to take Ms. Miller to jail, Ms. Miller asked him to put her seat belt on since her hands were cuffed and she could not do it herself. (Ex. A, <u>Miller Depo</u>., 43:24 – 44:05). But, Maddox refused to do so. *Id*. At 12:22 A.M., Maddox headed to the Criminal Justice Center ("CJC") with Ms. Miller riding handcuffed in the back of his patrol car. (Ex. L, <u>Dispatch Recording</u>). Maddox sped on the way to the CJC, knocking Ms. Miller around and causing her wrists to be bruised by the handcuffs. (Ex. A, <u>Miller Depo</u>., 44:20 – 45:25).

Maddox parked at the CJC and used his patrol car computer to draft and print off an arrest report for the incident, which he had to turn over to the Sheriff's Department along with Ms. Miller in order to book her into jail. (Ex. K, <u>Maddox Depo</u>., 38:18 – 41:05). Maddox made numerous false claims against Ms. Miller in the arrest report, claiming that she had run the stop sign at Rowan and Cravath, that she had sped on Baldwin Court, that her speed was unsafe, that she had smelled of marijuana, that he had had to forcibly remove her from her vehicle, and that

5

she had jerked away from him. (Ex. M, Arrest Report, at 2). In completing the arrest report, Maddox designated himself as "P" for "Prosecutor" and noted that he was charging Ms. Miller with the crimes of "Resisting a Stop, Frisk, Halt, or Arrest" and "Reckless Driving." (Ex. M, Arrest Report). Maddox then delivered Ms. Miller along with the arrest report to the sheriff's department for booking. (Ex. K, Maddox Depo., 39:20 – 40:19). After handing Ms. Miller off to booking, Maddox drafted warrant affidavits on a CJC computer to present to the night court commissioner in order to file formal charges against Ms. Miller. (Ex. K, Maddox Depo., 40:20 – 41:13). Maddox did not consult with a representative of the District Attorney's Office before he unilaterally filed the charges. (Ex. K, Maddox Depo., 42:06 – 42:12; Ex. N, Vorhaus Depo., 17:15 – 18:12; Ex. O, Kyle Anderson Depo., 37:13 – 37:18). Maddox made numerous false allegations against Ms. Miller in the warrant affidavits, claiming that he had had a clear unobstructed view of the stop sign, that Ms. Miller had run the stop sign, that Ms. Miller had accelerated onto Baldwin at a high rate of speed, that after he pulled behind Ms. Miller she had continued for "several hundred yards" to the end of the street, that there had been several people walking on Baldwin Court as Ms. Miller drove by, that Ms. Miller had a strong odor of marijuana on her, that officers had had to pull Ms. Miller out of her car, and that Ms. Miller had jerked her arm and tried to twist her body away from the arrest. (Ex. P, General Sessions Warrants). Maddox presented the warrants to the commissioner, and swore under oath that his false allegations against Ms. Miller were true. (Ex. P, General Sessions Warrants; Ex. Q, Tommy Bradley Depo., 7:14 – 10:02; Ex. K, Maddox Depo., 41:15 – 42:15). Based on Maddox's sworn testimony, the commissioner approved the charges against Ms. Miller. (Ex. K, Maddox Depo., 41:15 – 42:15; Ex. P, General Sessions Warrants; Ex. Q, Tommy Bradley Depo., 7:14 – 10:02). The commissioner then set Ms. Miller's "Conditions of Release" on the charges,

ordering that Ms. Miller be detained in jail until she either posted a $3,000 bond or was accepted by the Sheriff's Office's Pretrial Services Program. (Ex. R, Conditions of Release, ¶ 3). The order further stated that should Ms. Miller be accepted by the Pretrial Services Department for supervision, the Department "shall maintain close contact with the Defendant, assist the Defendant with in making arrangements to appear in Court, and, where appropriate, accompany the Defendant to Court." (Ex. R, Conditions of Release, ¶ 3). Ms. Miller remained in jail for another thirty to forty-five minutes while she was screened and approved by the Pretrial Services program, and was then released from jail under the terms of their program. (Ex. A, Miller Depo., 57:17 – 58:17; Ex. E, Andrea Miller Decl., ¶¶ 5 – 9; Ex. E-2, Pretrial Services Agreement). Under the terms of the Pretrial Service program, Ms. Miller would remain free from jail as long as she paid $35,[2] attended all her court dates, and called her supervision officer every week. (Ex. A, Miller Depo., 58:03; Ex. E, Andrea Miller Decl., ¶¶ 5 – 9; Ex. E-2, Pretrial Services Agreement). The Pretrial agreement explicitly stated, "You MUST comply with the conditions to remain out of jail on Pretrial." (Ex. E-2, Pretrial Services Agreement).

Once the commissioner approved the charges, the General Sessions court clerk computer system automatically docketed the case in General Sessions Court. (Ex. Q, Tommy Bradley Depo., 7:14 – 10:02). Ms. Miller's case was set for a September 22, 2011 "settlement" docket, a docket in which witnesses are not subpoenaed and the purpose is to see which cases can be easily resolved through a plea bargain. (Ex. S, DA File General Sessions Notes; Ex. N, Vorhaus Depo., 29:05 – 30:08). The settlement docket was the first time that an Assistant District Attorney would have looked at the case. (Ex. O, Kyle Anderson Depo., 37:13 – 37:18). Ms. Miller paid

---

[2] Ms. Miller mistakenly testified at her deposition that the Pretrial Release fee was forty-five dollars ($45); however, the fee was actually thirty-five dollars ($35). (Ex. E, Andrea Miller Decl., fn. 1; Ex. E-2, Pretrial Services Agreement).

7

$600 to hire Attorney Kurt Bartlett to represent her in General Sessions.  (Ex. A, <u>Miller Depo</u>., 59:22 – 60:17).  The Assistant D.A. on the settlement docket offered Ms. Miller a deal to resolve the case for public service work, which Ms. Miller declined.  (Ex. S, <u>DA File General Sessions Notes</u>).  The case was then set for a "trial" docket on November 3, 2011.  Maddox was the only State's witness subpoenaed to attend.  (Ex. S, <u>DA File General Sessions Notes</u> ; Ex. N, <u>Vorhaus Depo</u>., 30:09 – 31:11).

Assistant District Attorney David Vorhaus handled the November 3, 2011 trial docket, which included the case against Ms. Miller as well as cases against some sixty (60) to ninety-five (95) other defendants.  (Ex. N, <u>Vorhaus Depo</u>., 7:10 – 13:06, 15:21 – 16:14).  In the words of Mr. Vorhaus, General Sessions is a "meatgrinder" because of the high daily case volume and the minimal time available for each case.  (Ex. N, <u>Vorhaus Depo</u>., 6:22 – 6:23). While Mr. Vorhaus does not recall Ms. Miller's case, the typical protocol in the "gristmill"[3] of General Sessions Court was for the A.D.A. to receive the case file about a week before the docket, but to not actually have time to read it until the night before court.  (Ex. N, <u>Vorhaus Depo</u>., 6:22 – 7:09, 13:12 – 14:01).  The file included the warrants, arrest report, and the defendant's local criminal history.  *Id.*  When Mr. Vorhaus reviewed the file he would rely on the officer's warrants and arrest reports to develop the gist of operative facts in the case, which he would then handwrite on his docket.  (Ex. N, <u>Vorhaus Depo</u>., 12:20 – 13:06, 14:21 – 15:20).

Because of the high case volume, Mr. Vorhaus generally did not have time to discuss charges with officers prior to conducting preliminary hearings.  (Ex. N, <u>Vorhaus Depo</u>., 8:10 – 8:16, 22:07 – 22:20).  At Ms. Miller's hearing, Maddox was the only State's witness who testified, and his testimony basically reiterated the same false allegations that he had made in his

---

[3] Another of A.D.A. Vorhaus's colorful terms for the Davidson County General Sessions Court.  (Ex. N, <u>Vorhaus Depo.</u>, 16:24 – 16:25).

warrants and arrest report. (Ex. F, <u>Preliminary Hearing Transcript</u>, 1:41 – 2:21). Based on Defendant's false testimony, the General Sessions judge bound the case over to the grand jury, opining, "This case illustrates the difference between proof beyond a reasonable doubt and probable cause." (Ex. F, <u>Preliminary Hearing Transcript</u>, 9:10 – 9:13).

Once the case was bound over, it went through Davidson County's standardized process of preparation and presentation to the grand jury. First, the file was reviewed by MNPD's civilian-staffed "Case Prep" unit to develop a "Case Prep Summary," a narrative summary of the operative factual allegations in the case. (Ex. T, <u>Kim Burnett Depo</u>., 5:10 – 6:12). In Ms. Miller's case, Ms. Kim Burnett drafted the Case Prep Summary. (Ex. T, <u>Kim Burnett Depo</u>., 9:21 – 9:24; Ex. U, <u>Case Prep File</u>, at 4; Ex. O, <u>Kyle Anderson Depo</u>., 46:06 – 46:14). While Ms. Burnett does not remember Ms. Miller's case, Ms. Burnett's job was to develop the summary narrative based on the facts that were alleged in the arrest reports and warrant affidavits in her file. (Ex. T, <u>Kim Burnett Depo</u>., 16:10 – 18:05). In Ms. Miller's case, Officer Maddox was the sole author of the warrants and reports in the file. (Ex. U, <u>Case Prep File</u>).

After Ms. Burnett finished the summary narrative, the file was sent to the District Attorney's Office per Davidson County's typical protocols. (Ex. O, <u>Kyle Anderson Depo</u>., 21:03 – 21:12). Assistant District Attorney Kyle Anderson, the head of the Davidson County District Attorney's Office's traffic enforcement team, received the file from Case Prep and prepared the indictment based on the factual allegations in the arrest reports, warrant affidavits, and Case Prep summary. (Ex. O, <u>Anderson Depo</u>., 21:03 – 21:12, 25:05 – 27:02). Noting that one of the factual allegations made by Maddox was that Ms. Miller failed to stop for his "blue lights," Mr. Anderson added a count for Evading Arrest in the indictment. (Ex. O, <u>Anderson Depo.</u>, 25:15 –

27:02).  Anderson then delivered the file and the proposed indictment to MNPD Sergeant David

Liles, whose job was to present cases to the grand jury.  (Ex. O, Anderson Depo., 24:04 – 25:14).

Sergeant Liles was one of two MNPD sergeants whose regular duty was to present cases

to the grand jury. (Ex. O, Anderson Depo., 8:11 – 9:01; Ex. V, Liles Depo., 7:07 – 8:05).  In

performing this duty, Sergeant Liles's job was to present a factual narrative to the grand jury

which accurately presented the factual allegations in the file.  (Ex. V, Liles Depo., 13:07 –

13:25).  Sergeant Liles's protocol in developing the presentation narrative was to use the Case

Prep Summary, warrants, and reports in the file to develop a cogent factual narrative that

succinctly stated the operative factual allegations in the case.   (Ex. V, Liles Depo., 10:03 –

12:02).  While Sgt. Liles does not recall Ms. Miller's case, the only sources of factual allegations

in the file he received were Ms. Burnett's Case Prep Summary, Maddox's arrest report, and

Maddox's arrest warrants.  (Ex. V, Liles Depo., 25:07 – 26:10; Ex. U, Case Prep File).  Because

of that, Sergeant Liles would have based his grand jury narrative on the Case Prep Summary,

arrest report, and warrants.  (Ex. V, Liles Depo., 25:07 – 26:10; Ex. U, Case Prep File).

When it came time to actually present his cases, Sergeant Liles typically presented some

twenty-five (25) to thirty-five (35) cases per day, testifying to multiple cases in the same interval

and then leaving the room for the grand jury's deliberations.  (Ex. V, Liles Depo., 9:06 – 9:13,

22:15 – 23:14).  At the start of each session, the grand jury foreperson would receive all of the

proposed indictments *en masse* from a secretary.  (Ex. V, Liles Depo., 22:15 – 23:05).  Sergeant

Liles would then present the cases, going under oath and dutifully testifying to the allegations

from his files.  (Ex. V, Liles Depo., 10:19 – 13:25).  Davidson County does not record or

transcribe its grand jury proceedings, and criminal defendants are not permitted any access to

them.  (Ex. O, Anderson Depo., 9:10 – 9:24, 19:20 – 20:05).  Sergeant Liles presented the case

against Ms. Miller to the grand jury on March 20, 2012, and was the lone witness for that proceeding. (Ex. W, Indictment). Based on Sergeant Liles' testimony, the grand jury issued a "True Bill" against Ms. Miller on all counts. (Ex. W, Indictment).

After she was indicted, Ms. Miller was arraigned in Criminal Court and entered a plea of "Not Guilty" on all counts. She contested the allegations until A.D.A. Kyle Anderson entered a *nolle prosequi* on December 7, 2012, the eve of Ms. Miller's jury trial. (Ex. X, DA Final Summary, at 1). On June 7, 2013, Criminal Court Judge Mark Fishburn dismissed the case. (Ex. Y, 6/17/13 Minute Entry).

## ARGUMENT

### A. The Prosecution was Initiated by Defendant's General Sessions Charges, Not the Grand Jury Indictment

As the Sixth Circuit held in *Sykes v. Anderson*, one of the elements of a Fourth Amendment malicious prosecution claim is that the Defendant "initiated*"* the prosecution without probable cause. *Sykes v. Anderson*, 625 F.3d 294, 310 – 311 (6th Cir. 2010). "In order to distinguish appropriately this claim from false arrest, we must consider not only whether the Defendants had probable cause to arrest the Plaintiff[] but also whether probable cause existed to *initiate* the criminal proceeding against the Plaintiff[]." *Sykes*, at 310 – 311 (emphasis added). Thus, to establish Defendant's liability Ms. Miller must prove that Maddox initiated the prosecution of her without probable cause. Notably, both this Court and the Sixth Circuit have already held that Maddox initiated the prosecution of Ms. Miller by filing the General Sessions charges against her on August 31, 2011. (*See* ECF 42, at 2 ("Defendant acted unilaterally by filing allegedly false charges against Plaintiff."); *Maddox v. Miller*, Sixth Circuit Case No. 14-6216, ECF 20-2, at 4) ("The issuance of arrest warrants constitutes a 'legal process.'"). Thus,

11

because the prosecution was initiated by the filing of the General Sessions warrants, the relevant inquiry as to the probable cause element is whether or not Maddox had probable cause to file the General Sessions warrants.

Disregarding *Sykes*'s focus on the *initiation* of the prosecution, Defendant argues that the grand jury indictment is preclusive as to the probable cause element. (ECF 61, Defendant's Memo, at 8 – 11). However, because the prosecution was initiated by Defendant's August 2011 General Sessions warrants, not the March 2012 grand jury indictment, the grand jury indictment is fundamentally irrelevant to the question of whether or not Maddox had probable cause to initiate the prosecution. See *Sykes*, at 310 – 311; (Ex. P, General Sessions Warrants; Ex. W, Indictment). Indeed, the cases holding that grand jury indictments are preclusive as to probable cause are cases in which the prosecution was actually initiated by the grand jury indictment, rather than a prior warrant. *See, e.g.*, *Snow v.* Nelson, 634 Fed. Appx. 151, 154 (6th Cir. 2015) ("[A] grand jury indicted Snow on all four counts. Snow was subsequently arrested…."); *Barnes v. Wright*, 449 F.3d 709, 712 – 713 (6th Cir. 2005) (Plaintiff arrested on indictment the day after grand jury issued it); *Webb v. United States*, 789 F.3d 647, 654, 656 (6th Cir. 2015) (Both plaintiffs arrested after being indicted by grand jury); *Davis v. McKinney*, 422 Fed. Appx. 442 (6th Cir. 2011) (Plaintiff initially charged through grand jury indictment). Moreover, while Plaintiff has not identified malicious prosecution case law explicitly addressing the issue of an officer attempting to rely on a subsequent indictment to establish probable cause for his having previously initiated a prosecution by filing false warrants, the false arrest case law clearly states that "a subsequent indictment cannot be used to establish probable cause for an earlier arrest." *Brown v. Village of Lincoln Heights*, 2013 WL 5937015, * 9 – 11 (S.D. Ohio 2013) (citing *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 307 n.13 (6th Cir. 2005)). Here, the same

principle applies because under *Sykes* the issue is whether the charges were *initiated* without probable cause.  *Sykes*, at 310 – 311.  Thus, a grand jury indictment obtained seven months after the filing of charges is simply irrelevant.

### B.  Maddox Lacked Probable Cause to File the General Sessions Warrants

For purposes of summary judgment, all contested facts must be construed in the light most favorable to Ms. Miller.  *Bennett v. City of Eastpointe,* 410 F.3d 810, 817 (6th Cir. 2005).  Therefore, construed in the light most favorable to Ms. Miller the record clearly establishes that Maddox did not have probable cause to charge her with either "Reckless Driving" or "Resisting a Stop."[4]  Under Tennessee law, a person is guilty of *Reckless Driving* when he drives "in willful or wanton disregard for the safety of persons or property."  T.C.A. § 55-10-205.  In the light most favorable to Ms. Miller, the record shows that she stopped at the stop sign at Rowan and Cravath, safely made the right turn onto Rowan, safely made the right turn onto Baldwin Court, and then safely finished the short drive to her home without exceeding the speed limit and without encountering or endangering any pedestrians.  (Ex. A, Miller Depo., 29:20 – 30:02, 32:02 – 32:04, 33:23 – 34:16, 35:04 – 35:12; Ex. C, Map of Baldwin Court Area; Ex. F, Preliminary Hearing Excerpt, 7:02 – 7:08; Ex. G, Lot Map of Baldwin Court Area).  Thus, for purposes of summary judgment the record conclusively establishes that Maddox had no basis whatsoever, much less probable cause, to charge Ms. Miller with *Reckless Driving*.  Tennessee law defines *Resisting a Stop* as "prevent[ing] or obstruct[ing] anyone known to the person to be a law enforcement officer, or anyone acting in a law enforcement officer's presence and at the officer's direction, from effecting a stop … of any person, including the defendant, *by using*

---

[4] Indeed, Defendant's memorandum does not even attempt to argue probable cause on the factual merits, instead relying entirely on the grand jury argument.

13

*force* against the law enforcement officer or another." T.C.A. § 39-16-602 (emphasis added). Here, the record shows that while Ms. Miller may have initially refused to get out of her car and may have yelled at Maddox for pulling her over, she eventually got out of the car on her own and did not physically struggle when Maddox placed her under arrest. (Ex. A, <u>Miller Depo.</u>, 30:17 – 31:01, 38:07 – 38:23; Ex. I, <u>Dwight Smith Depo.</u>, 9:24 – 10:02, 10:15 – 10:17, 11:20 – 11:25, 12:06 – 13:07, 20:10 – 21:08, 22:07 – 23:12). Therefore, for purposes of summary judgment the record conclusively establishes that Ms. Miller did not use "force against the law enforcement officer or another," and that Maddox had no basis whatsoever, much less probable cause, to charge her with *Resisting a Stop*.[5] T.C.A. § 39-16-602.

Finally, the record amply demonstrates that for purposes of summary judgment Maddox's warrant affidavits and testimony to the commissioner must be considered to have been false. As such, the night court commissioner's determination that there was probable cause to issue the charges is not preclusive as to the probable cause element, because the commissioner's determination was based entirely on Maddox's false testimony. *Sykes v. Anderson*, 625 F.3d 294, 312 (6th Cir. 2010). Therefore, for purposes of summary judgment Ms. Miller has amply demonstrated that Maddox lacked probable cause to file the charges against her.

### C. The Grand Jury Indictment was the Product of Officer Maddox's False Affidavits and Arrest Reports

Even if *Sykes* were interpreted to consider the grand jury indictment relevant to the probable cause issue, the indictment would not be preclusive because it was the product of Defendant's false affidavits and reports. Admittedly, Defendant did not personally testify to the

---

[5] Defendant appears to take some pains to distinguish his charge of "Resisting a Stop" from the charge of "Resisting Arrest," but any theoretical difference between the two offenses is immaterial because both contain the same "use of force" element. T.C.A. § 39-16-602.

14

grand jury, and the person who did, MNPD Sergeant Liles, did not knowingly lie in his

presentation. Regardless, because the indictment was the result of a testimonial narrative that

was ultimately based on Defendant's false warrant affidavits and false arrest report, the

indictment was fundamentally tainted and has no preclusive effect. See *Snow v. Nelson*, 634

Fed. Appx. 151, 156 – 157 (6th Cir. 2015) (Grand jury indictment is not preclusive as to probable

cause where it is based on presentation of deliberately or recklessly false evidence).

   While Sergeant Liles does not specifically remember Ms. Miller's case, his job was to

present a testimonial narrative based on the factual allegations in the file that he received. (Ex.

V, Liles Depo., 13:03 – 13:25). Since Sergeant Liles had no personal knowledge of the cases he

presented, the only significance of his testimonial oath to tell the truth was to honestly report the

factual allegations in his file. (Ex. V, Liles Depo., 13:03 – 13:25). Here, the only sources of

factual allegations in Sergeant Liles's file were Maddox's warrant affidavits, Maddox's arrest

report, and the MNPD Case Prep Summary narrative. (Ex. U, Case Prep File). While the Case

Prep Summary was technically authored by civilian MNPD employee Kim Burnett, Ms. Burnett

developed the summary by relying on Maddox's warrants and report, and it was essentially just a

regurgitation of Maddox's false allegations. (Ex. T, Kim Burnett Depo., 16:10 – 18:05.; Ex. U,

Case Prep File). Thus, while Sergeant Liles may not specifically recall the narrative he

presented to the grand jury, the only reasonable inference under these circumstances is that the

narrative's operative factual allegations derived exclusively from Maddox's false arrest report

and warrants. *See Snow v. Nelson*, at 157 ("All reasonable inferences must be drawn in favor of

the nonmoving party").

   Defendant argues that because there is no recording of the grand jury testimony, and

because Sergeant Liles does not recall his presentation narrative, Plaintiff cannot establish what

was said to the grand jury in order to show that it was false. (ECF 61, <u>Defendant's Memo</u>, at 9). However, given that Defendant was the only original source of evidence or allegations against Ms. Miller, this argument basically supposes that that Sergeant Liles might have presented a completely random narrative out of left field that was not based on the information in his file, such that the grand jury might have true billed the charges based on evidence that did not originate with the Defendant. However, given that Sergeant Liles took a solemn testimonial oath to accurately present the allegations from the file, the only reasonable inference is that he did so. (Ex. V, <u>Liles Depo</u>., 13:03 – 13:25). Indeed, the fact that the grand jury "true billed" the charges corroborates the inference that Sergeant Liles must have accurately conveyed Defendant's false factual allegations, since the charged offenses were consistent with Defendant's allegations. Moreover, Defendant's cases on this issue acknowledge that "all reasonable inferences" must be drawn from the record in favor of the nonmoving party. *Snow v. Nelson*, at 157. In *Snow*, the record was too ambiguous for the plaintiff to prevail, and indeed that record actually established probable cause against Snow independently of the indictment. *Id.* at 157 – 158. However, in Ms. Miller's case the record is not at all ambiguous, and the only reasonable inference is that the grand jury presentation derived from Maddox's false allegations. Thus, even without a direct record of the grand jury proceeding, it is clear that the operative factual allegations presented to the grand jury derived from Maddox's false warrants and arrest report.

Defendant also attempts to assert qualified immunity on this issue, arguing that he is entitled to immunity because he did not himself directly testify to the grand jury. (ECF 61, <u>Defendant's Memo</u>, at 11). However, this argument fails to acknowledge that Maddox violated Ms. Miller's clearly established Fourth Amendment rights by filing the false charges against her in the first place. *Maddox*, Sixth Circuit Case No. 14-6216, ECF 20-2, at 2 – 3 ("As early as

1999, we held that 'a reasonable police officer would be on notice that unlawfully detaining a suspect, despite the fact that the evidence used to detain that individual, was fabricated, would … be unlawful.'") (Quoting *Spurlock v. Satterfield*, 167 F.3d 995, 1006 – 1007 (6th Cir. 1999).

Indeed, *Spurlock*, one of the principal cases relied on by the Sixth Circuit to affirm the denial of Defendant's original motion to dismiss in this case, involved a denial of qualified immunity to a defendant-officer who did not personally testify to the grand jury. In that case, the officer was alleged to have suborned a witness to testify falsely against that plaintiff in order to have the plaintiff indicted. *Spurlock v. Satterfield*, 167 F.3d 995, 997 – 1007 (6th Cir. 1999). Thus, the *Spurlock* defendant did not personally testify to the grand jury, but rather induced another to present false evidence. *Id.* at 999. Notwithstanding the fact that the *Spurlock* defendant did not personally testify, his claim to qualified immunity was denied because he had participated in procuring a false indictment by arranging for the presentation of false evidence to a grand jury. *Id.* at 1007. Thus, the Sixth Circuit has already recognized that the "false evidence" exception is not so narrowly circumscribed as Defendant would like.

Likewise, other circuit courts have not circumscribed the "false evidence exception" to instances in which the defendant personally testified falsely. *See, e.g., Rothstein v. Carrere*, 373 F.3d 275, 282 – 283 (2nd Cir. 2004) (Indictment not preclusive if it was produced by "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith."); *Rose v. Bartle*, 871 F.2d 331, 353 (3rd Cir. 1989) (Indictment not preclusive if "procured by fraud, perjury, or other corrupt means."); *Hand v. Gary*, 838 F.2d 1420, 1426 (5th Cir. 1988) (Indictment not preclusive when "tainted by the malicious actions of government officials."); *Harris v. Roderick*, 126 F.3d 1189, 1198 (9th Cir. 1997) (Explicitly adopting reasoning from

*Hand*)).  Thus, Defendant's vain hope that "false evidence" exception can only be established where the defendant personally testifies falsely is simply not borne out by the case law.

Indeed, Officer Maddox both initiated the false charges in the first place and provided the false reports that became the factual basis for Sergeant Liles's grand jury testimony.  Moreover, for purposes of summary judgment the record clearly establishes that Maddox knew that his allegations were false.  *Meeks v. Larsen*, 611 Fed. Appx. 277, 282 (6th Cir. 2015) ("There is an exception to [the general rule regarding the preclusive effect of grand jury indictments] when the defendants knowingly presented false testimony to the grand jury to obtain the indictment … or testified with reckless disregard for the truth.").  Thus, the indictment is not preclusive because it was based on false evidence knowingly supplied by the Defendant.

As a final note on this issue, Defendant's argument is extremely troubling from a policy standpoint in that it would essentially allow municipal governments to immunize themselves and their police officers from malicious prosecution liability for any case that ends up going through the "bound over" process.  By employing the system that Davidson County does, wherein the function of grand jury testimony is delegated away from the actual prosecuting officers and the grand jury proceedings are not recorded, under Defendant's theory a local government could render it virtually impossible for any plaintiff to ever demonstrate the "false testimony exception" to the grand jury indictment rule.[6]  Grand jury proceedings are *ex parte* matters that are exclusively in the control of local municipal governments, and criminal defendants have no right of access to such proceedings.  As such, under Defendant's theory officers could freely manufacture false charges against innocent defendants so long as they employed unknowing "patsies" to present the cases in *ex parte, en masse,* unrecorded, and swiftly forgotten grand jury

---

[6] Indeed, Plaintiff feels compelled to point out that Defendant's theory is being advanced by the Davidson County Metropolitan Department of Law.

18

proceedings. Thus, Defendant's theory would fundamentally undermine both the Fourth

Amendment and the purposes of 42 U.S.C. § 1983, and cannot be allowed to prevail.

### D. Defendant's General Sessions Warrants Infringed Ms. Miller's Liberty

Defendant next argues that his false charges did not infringe Ms. Miller's liberty. (ECF

61, Defendant's Memo, at 11 – 14). However, both this Court and the Sixth Circuit have

effectively already addressed this issue, holding that the period during which Ms. Miller was

detained in jail on the criminal charges, before she was released on pretrial release, constituted

an infringement of liberty. "The detention that Miller challenges is the three-to-four hour period

of confinement that resulted from the allegedly wrongful institution of this legal process." Sixth

Circuit Case No. 14-6216, ECF 20-2, at 4. "This is the exact harm that a malicious prosecution

claim is intended to remedy." *Id*. While the record now establishes that Ms. Miller's period of

post-charge confinement was only forty-five minutes, rather than three or four hours, that

difference is immaterial to the question of whether her liberty was infringed. Regardless of how

many minutes or hours Ms. Miller was held on the charges, the fact is that the commissioner

ordered her detained until she either posted bond or was released under the supervision of the

Pretrial Release Program. (Ex. R, Conditions of Release). Consequently, Ms. Miller was

detained in jail for 30 – 45 minutes until she was released on Pretrial. (Ex. A, Miller Depo.,

57:17 – 58:17; Ex. E, Andrea Miller Decl., ¶¶ 5 – 9; Ex. E-2, Pretrial Services Agreement).

Thus, the charges infringed Ms. Miller's liberty.

Moreover, in addition to the initial infringement of the jail time, Ms. Miller suffered

continued infringement throughout the duration of her criminal case because her release was

subject to the supervision and conditions of the Sheriff's Office's Pretrial Release program,

which required her to call in every week as a continuing condition of her freedom. (Ex. E, Miller

19

Decl., ¶¶ 5 – 9; Ex. E-2, <u>Pretrial Services Agreement</u>; Ex. R, <u>Conditions of Release</u>).  Indeed, as required Ms. Miller did in fact call her Pretrial Officer every week, making some sixty-six (66) compulsory calls over the course of her case.  (Ex. E, <u>Miller Decl.</u>, ¶¶ 10 – 11).  Thus, in addition to the initial infringement of the post-charge jail time, Ms. Miller's liberty was continuously infringed throughout the pendency of her case.

As to the cases cited by Defendant in support of his argument, they are factually distinguishable and largely irrelevant because they do not address scenarios in which plaintiffs were detained on criminal charges.  In *Billock v. Kuivila*, 2013 WL 591988 (N.D. Ohio 2013), the Plaintiff failed to even assert a post-charge detention, alleging simply, "'Plaintiff was arrested' and 'the case proceeded with a trial to the bench'."  *Billock*, at *18.  The Plaintiff did not "allege that he was required to post bond, that his travel was restricted, or that any other restriction was placed on him, apart from his initial arrest."  *Id.* at * 18 – 19.  Thus, *Billock* did not address the scenario of a plaintiff being subjected to a period of post-charge detention before being conditionally released.  Similarly, the Plaintiff in *Ghaster v. City of Rocky River* failed to allege any specific facts whatsoever showing that his liberty was infringed.  *Ghaster v. City of Rocky River*, 913 F. Supp. 2d 443, 455 – 456 (N.D. Ohio 2012).  Rather, the *Ghaster* plaintiff alleged only generically that "'Plaintiff suffered a loss of liberty'," and the Plaintiff failed to allege any "accompanying fact plausibly showing that loss of liberty."  *Id.* at 456.  Thus, as in *Billock, Ghaster* simply did not involve a plaintiff who was detained post-charge and then conditionally released during the pendency of the charges.  Defendant's next case, *Kinlin v. Kline*, involved a plaintiff who was initially taken into custody for a breathalyzer test but who was then released with a citation.  *Kinlin v. Kline,* 2012 WL 3780461, * 2 – 4 (N.D. Ohio 2012).  Citations, by their very nature, do not impose post-charge detention, and thus *Kinlin*, like *Billock*

and *Ghaster*, is simply irrelevant to the scenario of a plaintiff who is jailed on warrants and then conditionally released pending trial. *See id*. at * 2 – 4, 15 – 16. Defendant's next case, *Denard v. Williams*, did not even involve criminal charges at all, and instead was a case about a plaintiff who was arrested and then released without charges. *Denard v. Williams*, 2011 WL 4374534, * 1 – 2, 21 – 23 (E.D. Mich. 2011). Obviously, given that the Plaintiff in *Denard* was not even charged with crimes, *Denard* has no bearing whatsoever on the scenario of a plaintiff who is detained in jail post-charge and then conditionally released pending trial. Finally, *Williams v. Crosby*, Defendant's last case, is similarly irrelevant in that it did not address a scenario in which the plaintiff was detained post-charge. *Williams v. Crosby*, 43 F. Supp. 3d 794 (N.D. Ohio 2014). Instead, "[A]fter appearing before a municipal court judge, [the plaintiff] was [released to her husband on bond….'" *William*s, at 804. Thus, the Plaintiff in *Williams* simply failed to allege or establish that she was detained post-charge for any length of time, whereas Ms. Miller was jailed for 30 – 45 minutes based on an order that she be confined unless she either posted bond or was released under the supervision of Pretrial Services. (Ex. A, <u>Miller Depo</u>., 57:17 – 58:17; Ex. E, <u>Andrea Miller Decl</u>., ¶¶ 5 – 9; Ex. E-2, <u>Pretrial Services Agreement</u>; Ex. R, <u>Conditions of Release</u>). Therefore, like Defendant's other cases *Williams* is simply irrelevant.

Indeed, other courts in the Sixth Circuit that have addressed claims similar to Ms. Miller's have held that the infringement of liberty element was met. *See, e.g., Amine v. King*, 2011 WL 4387229, *41 – 42 (E.D. Mich. 2011) (Plaintiff who was detained on charges and then made bond the next day suffered a deprivation of liberty for malicious prosecution purposes); *Thomas v. Bedford County*, 2011 WL 833626, * 19 (E.D. Tenn. 2011) ("Plaintiff was held at the Bedford County Jail and had to post bail to be released, which should be sufficient to establish that Plaintiff suffered a deprivation of liberty as a consequence of the criminal charges."). Thus,

Defendant's argument is simply wrong, as the Sixth Circuit has already held in this case. *Maddox v. Miller*, Sixth Circuit Case No. 14-6216, ECF 20-2, at 4. ("This is the exact harm that a malicious prosecution claim is intended to remedy.")

### E. Defendant "Participated in the Prosecution" by Initiating the Charges

In spite of having already spent a year unsuccessfully litigating this exact argument up to the Sixth Circuit, Defendant argues yet again that he did not "participate" in this prosecution within the meaning of *Sykes*. (ECF 61, <u>Defendant's Memo</u>, at 14 – 18). Defendant's incorrect, now-borderline frivolous argument has already been rejected by this court and the Sixth Circuit. "In light of *Wallace* and *Sykes*, it was clearly established at the time of Miller's arrest that the submission of affidavits to a General Sessions Court for the purpose of obtaining arrest warrants and initiating criminal charges could give rise to a Fourth Amendment claim of malicious prosecution." *Maddox*, Sixth Circuit Case No. 14-6216, ECF 20-2, at 4. Regardless, Defendant argues yet again that the "real" prosecutors in this case were the representatives of the District Attorney's office, that the "real" prosecution did not begin until Ms. Miller was indicted by the grand jury, and that that all Maddox did was make an arrest and fill out some forms. (ECF 61, <u>Defendant's Memo</u>, at 14 – 18). However, as the Sixth Circuit held in *Sykes*, "'[I]f police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him…. [Officers] cannot hide behind the officials whom they have defrauded.'" *Sykes*, at 317 (Quoting *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988)). While one can certainly understand Defendant's hope that he might absolve himself of responsibility by repeatedly pointing to the subsequent acts of other officials, these red herrings fail to acknowledge the fact that no prosecutor, magistrate, judge, or grand juror would have ever

22

even encountered these charges but for Maddox having unilaterally filed them. (Ex. K, <u>Maddox Depo.</u>, 42:06 – 42:12; Ex. N, <u>Vorhaus Depo.</u>, 17:15 – 18:12; Ex. O, <u>Kyle Anderson Depo.</u>, 37:13 – 37:18). Thus, as the Sixth Circuit has already held in response to Maddox's last motion, Maddox "participated" in this prosecution by filing the false charges.

## CONCLUSION

Based on the foregoing, Ms. Miller respectfully asks that Defendant's motion for summary judgment be denied.

Respectfully submitted,

*s/ Kyle Mothershead*
Kyle Mothershead, BPR 22953
414 Union Street, Suite 900
Nashville, TN 37219
T: (615) 982-8002 / F: (615) 229-6387
E: kyle@mothersheadlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on **June 27, 2016** a copy of the foregoing **Plaintiff's Response to Defendant's Motion for Summary Judgment** was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, including **Keli Oliver** and **Melissa Roberge**, Counsels for Defendant. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

*s/ Kyle Mothershead*
Kyle Mothershead